3, L.L.C. v. NLRB Thank you, Your Honor. Distinguished members of the panel, may it please the Court. We are here, we are present in this court because two federal agencies decided to disregard a balanced labor policy and focus their efforts, their combined efforts, against a small disadvantaged business. My client, H.P. 3, is a small disadvantaged business. It has experienced, since the beginning or since the infancy of this case, it has experienced arbitrariness at every turn. From the insourcing, whether you're in a position to complain about arbitrariness is what I'd like to find out. And that is, why did you get money from the government on the pretext of paying your employees severance pay and then didn't pay them? That's what I want to know, and what is your reason for getting the money and not paying them? Well, Your Honor, I don't think it was a pretext at all. Well, this says, just looking at a note in the National Labor Relations Boards, we note that prior to the hearing in this case, the respondent successfully gained reimbursement from the United States Air Force for severance payments for the respondent unconditionally stated that it was obligated to make, based on the same contract provisions relied on by the General Counsel and cited in the judge's decision. Yes, Your Honor. The Air Force does not agree with the sound arguable basis standard articulated, et cetera, but agree that under this standard, the respondent's failure to make severance payments violated the act. Well, Your Honor, if you look back at the record, respondent's exhibits, sorry, Your Honor. Did you make an application and the government for payment for the severance? Not unconditionally, Your Honor. But did you make a, they said. . . We did make an application. We did make an application, and the labor union did not join HP3 in that effort. And did you pay it? Did they pay you? The government did pay us, but they said they were going to claim it back if a court or an arbitrator decided that it was not warranted. Did you pay it to them? Did we pay it to the government? You got the money. You said, I unconditionally owe it. I agree. I owe it. Well, no, Your Honor. The government has said that, or the Air Force, the money is with HP3. It's where? It's with HP3. It's not paid to anybody. Is it set aside? Is it secured? I don't know that it's set aside. I don't know that, Your Honor. But I do know. . . Let me tell you from my point of view. Yes, Your Honor. The way I have read the briefs and the way I understand the record now, and you can change my mind, of course, is that that colors everything that you did or that your company did with a patina that casts a doubt on every position you take. Well, I understand that, Your Honor. I understand how it looks, and I understand the court's position on that. But the court also has to understand the position that HP3 was in. The government, as this court knows, under Litton and other cases like that, courts and arbitrators are the final arbiters of what a collective bargaining agreement says. The NLRB doesn't interpret agreements like this, and the Air Force was not going to consider it a binding decision on what the collective bargaining agreement meant until either an arbitrator or this court decided what the agreement meant. You wouldn't be entitled to the money if you weren't going to pay it. Well, Your Honor, that's not. . . HP3 has not said they're not going to pay it. They've just said that we don't know who's got the rightful claim to it. You are saying in this case that you do not owe it. Well, yes, Your Honor. If a court or an arbitrator says. . . But you said to them, I do owe it. Give me the money, they gave you the money. No, Your Honor, that's not correct. You don't owe it. That's not correct. That's a misrepresentation of the record. Well, if we take a look at the letters that started this whole issue, the July 13th and the July 9th, 2012 letters that are GCX 4 and 24, what those letters advised the union of was that we will. . . The government, the Air Force has told HP3 that severance pay is not owed. They said that at that time. And we said we will claim it if you will join us and we will pay it if it's paid depending on what happens in the future. Now. . . What did you just say? Depending on what happens. . . If it's paid. Yes. No, well, not exactly, Your Honor, because what happened was an intervening thing. What is the intervening thing? The intervening thing was a charge and refusal to defer arbitration because the arbitration was what was supposed to decide whether this was a termination or a layoff and whether it was owed or whether HP3 was a successor contractor underneath the agreement. You already represented to the government that it was owed. No, Your Honor. We said that we believe it's owed for these reasons, and we disagree with the Air Force's position. Even though you were saying you didn't know whether you owed it or not? Well, Your Honor, once the charge was filed and they bypassed arbitration in the grievance procedure, that placed HP3 in a totally different position. I still don't understand the question. I'm sorry, Your Honor. I will try diligently to answer that. I understand, but I'm completely lost as to how you can obtain the money from the government for this purpose and then say I'm going to determine hereafter whether I owe it. Because my understanding, correct me if I'm wrong, is that you represented to the government that you did owe it. Now, did you say to the government, I might owe this so pay us the $400,000 or $300,000 or $400,000 and I'll later determine whether we owe it or not? Well, what we represented to the government was that it was owed under the government's contract. I'm sorry. That it was owed under the government's contract, that the government had to pay HP3 this, and that it may be owed depending on whether this is a termination or a layoff. Now, the government said that to HP3. That's what started the entire thing. This claim was submitted and was pursued after the union already filed its charge. So we were placed in a position of having to pursue it during the pendency of a charge. When the charge was made, the issue was whether this was supposed to go to arbitration or not. And it was not whether this was paid or not. Now, it was fortuitously paid, but then the government immediately came back and said, if a court or an arbitrator decides that this is a termination or a layoff, we want it back, and we will claim it back. They would claim it back if what now? Because you had taken the position that it was a termination. Yes, well, the government was taking the position that it was. The Air Force was taking the position that it was a termination and not a layoff. So, therefore, it was not owed. And that is the letters that I was talking about earlier. The government was taking a position that it was not owed, but when you asked for the money, they paid it to you. Well, they ultimately paid it after about a year and a half. But, you know, that was during the pendency and right prior to the trial. They agreed to pay it. They didn't pay it. They paid it just right prior to the trial in this case. But that was during the period that we were also trying to ask the NLRB to defer to arbitration so we could definitively address the issue. If the government paid you money for that purpose, they had no other obligation to pay it other than for that purpose, and they paid it on that condition, why aren't you simply holding the property, essentially sort of a form of private custodial land, holding that money for the benefit of the people to whom it is owed? Well, Your Honor, as we've laid out in the brief, there are several competing claims to this money. There are other entities. There are banks. How about the bills is what you're saying. Well, there are other court cases, too. This is not the only one. Other court cases involving these employees? The work these employees did, yes, Your Honor. The work these employees did. The work that they did, but they're suing you for the work that they did. And you're going to, because the contract was not performed to the satisfaction of the work, you're going to dock the employees that performed the work. No, Your Honor, that's not what this is about. This is about whether the termination, this is a termination or a layoff. This is a contract interpretation issue. I understand that, but you're not holding the money because there were contracts that involved the work that these employees did, which means that you're going to charge them for their faulty work on a contract. No, Your Honor, we're not setting off the employees. We're just trying to get the, we have, from the beginning of the case, all HP3 tried to do was to enforce the collective bargaining agreement. All of it, not just part of it, not just the severance part, not just the vacation pay part, but also the grievance procedure part. At some point, labor policy got skewed in this country where we basically can disregard part of the collective bargaining agreement and construe it against or even disregard it against a contractor. Okay, but here's what I understand is that the labor board generally would say, yes, arbitration can take it if you agree to litigate the merits. What you were contending, according to the briefs here, is that the statute of limitations barred all of these claims. No, Your Honor, that is false too. That's a misrepresentation as well. If you look at Respondents Exhibit 3, page T116 to 117, exactly what we were going to do is laid out in those paragraphs. Were you going, did you agree to litigate fully the merits of the claims of the employees? Yes, Your Honor. The only thing that we did not agree to litigate, well, because they had their own agenda and didn't want to defer it. They wanted to pursue this as a labor charge rather than defer it to arbitration. The board did. So that is what we're saying is arbitrary is because they should have deferred this to arbitration so it could be definitively decided, and then the Air Force would not have the argument that no court or board has decided the issue, and therefore there's a pending claim. There's no pending claim. You're not raising the statute of limitation with respect to any of these claims. The only issue that we had raised is laid out in these paragraphs, and it's, I can read it. Well, I'm not going to read it, Your Honor. All we said was that we're with, we had sent those letters saying that we can't pay, that HP3 cannot pay this until the government pays. And so the government is, the Air Force is objecting to this and saying that it's a termination, not a layoff. So if we agree to defer this to an arbitrator, we can address all these substantive issues, whether it's a termination, whether it's a layoff, whether HP3 was a successor in interest. Before you got your money? Yes, Your Honor. And so we agreed to defer all these issues. The only issue that HP3 said that it would not waive is that the government couldn't pay until the government, the Air Force, paid it. That is the only issue. And initially the NLRB said yes, and then after the union complained, it withdrew the deferral and proceeded with the charge. But here we are five years later, you know, and we're sitting here in the court having to argue because the Air Force needs either a court or an arbitrator's decision to let go of its claim on HP3. And so, you know, if we had just agreed to defer this to arbitration at the time and decide those issues of whether it was a termination or a layoff or whether HP3 was a successor in interest, then we would not be here. I'm going to rush through. I've taken a lot of your time, and I'm going to give you some more time to make your argument. I want you to make all the points that you feel like you have to make. Okay, Your Honor. Three or four minutes. Yes, Your Honor. I'm interrupting. No problem, Your Honor. I understand. I mean, I know it is difficult to wrap the court's head around, but this is what happens to a small business when two agencies combine to go after them. We have one agency saying that has a contract with HP3 that's saying we don't owe this. This is a termination, not a layoff. We have another agency saying, you know, you do owe it. And here's HP3 in the middle trying to figure out what the best approach to this is. This case is not about the interpretation of the contract per se. This is a labor case. This is about whether what HP3 did prior to the charge was an unfair labor practice or not. And then, you know, and so when we look at what they did, all they did was ask for a determination, said we're going to rest on the grievance procedure itself with respect to whether or not HP3 will pay it before the Air Force pays it, as they're entitled to do. And so when we look at whether this case, the substance of this case, we look at the terms. Now, whether or not this is a termination or a layoff or whether or not HP3 was a success or an interest is decided not only by what the union said it was, but also by what happened in 2011. 2011 is the part of the record that is missing. There is nothing from 2011 except what the union was allowed to say about it. What was not allowed to be said was that HP3 was asked for a proposal from the government at that time to decide whether it needed to insource the contract and evaluate the wages to determine whether it was in the best interest of the government to proceed with HP3 or insource it. In that sense, there was a proposal at the time, and there was a bid. And HP3 went to the union and asked them to reduce their wages to compete with what the government wages were. Now, you won't find this in the record, Your Honor. The only reference to it you'll find in Respondents Exhibit 3. And the reason you won't find this in the record and the reason why it's so important is because the judge below did not allow any testimony with respect to anything that occurred in 2011. And so here we have... It's laid out in Respondents Exhibit 3, and it's also laid out, Your Honor, in the exceptions that the court asked for. The court asked for a complete record, and there's a September 8th document that was added to the record. Page 4 of that document talks about... Page 4 through 5 of that document talks about what was...that a rebid did take place and how that occurred. And that's Exception 1 in Document 513186848, Page 6, filed on September 9th, 2015. But those types of things, whether this is a... whether HB 3 had a sound arguable basis that it was a termination and not a layoff, that interpretation came from a government agency and HB 3 just simply forwarding it. If that wasn't a sound arguable basis, then it's the Air Force that was at fault for that. If it was... If HB 3 was not the successor contractor and it was not a termination or layoff, then all the major issues in this case, the severance and the vacation pay, go away. They're not...they are not... Because the carryover hours that were not paid and also the term... What are carryover hours? Carryover hours, Your Honor, are mentioned in the agreement. They are the hours that are carried forward from year to year, and they're not to be... They're leftover hours, like vacation hours, that are accrued. There's a maximum in carryover, but there's no carryover at all in the event that there is a... that HB 3 is not the successful contractor on a rebid. And so that was one of the main arguments. And one of the things that HB 3... There was no successor argument. The language is kind of awkward. Well, it's... It might be awkward, Your Honor, but in that context, we go back to M&G Polymers. We don't construe whatever... and accept whatever the union says. We have to construe things in the context of contract principles. And so CBAs, you know, if we look at M&G Polymers and D.R. Horton, those cases all talk about what we have to... what, you know, that there's no conflict between labor policy and the Arbitration Act. There's no conflict between contract principles and collective bargaining agreements. They're to be construed in the context of what happened, looking at exactly, you know, applying those facts to the law. The problem with the judge below is that he did not allow the facts of that situation to be put into the record, so we were lost in terms of being able to prove that argument. That was one of the major issues, and I'll reserve the rest of my time, Your Honor. Mr. Baines, you've saved some time for rebuttal. Thank you, Your Honor. Mr. Urella, you represent the National Labor Relations Board. You may please the Court. My name is James Urella for the National Labor Relations Board. I would like to begin by correcting a couple of misstatements made by opposing counsel. First, I will go to a letter that Hallmark Phoenix 3 sent to the Air Force on December 11, 2012. This is Respondents Exhibit 11, and I'm just going to read from it in this regard. And I quote, Once the U.S. Air Force made official that it would not exercise the fourth option year of the contract in July 2012, HP3 became obligated to pay severance at contract end to non-exempt employees as fringe benefits consistent with the provisions and conditions of each collective bargaining agreement. Additionally, the company did not ever give assurances that the merits of this dispute, of this contract interpretation dispute, as to whether or not there had been an unlawful midterm contract modification to the Board. Those were not given to the Board's regional director. Those could have been given before the administrative law judge, and they weren't. Those could have been given again before exceptions to the Board, and they weren't. What do you do with the statement that the ALJ wouldn't allow any evidence as to 2011? The company has never demonstrated how that was exactly relevant to interpreting the parties' agreement. There's no reference whatsoever in either the TWU or the IATSE CBAs about what constitutes the rebidding process, what role and what distinction there is between insourcing and outsourcing. What do you do with the response to Exhibit 3? Didn't that explain why that information was relevant and should have been heard? The Board concluded that that information wasn't based on that response, and that response was deficient. I think the crux of the matter is, as Judge Jolly opened with, is you can't have a sound, arguable basis if you're telling people that the contractual terms that mean one thing don't mean one thing, and then you turn around and say to another party that, no, in fact, these actually do mean what we're saying that they don't mean over here. And that's exactly what the company's done here. Well, but isn't that a question that's in dispute, that therefore the ALJ should have at least considered? Maybe the ALJ would have rejected the company's position, but I don't understand the justification for not allowing the information to be received and considered. I believe the lack of justification falls from the company, which is that looking within the four corners of the two agreements, it's unclear what relevance that information had. I realize, as the company has stated, it was very important to their interpretation of the agreement, but the... What was the information, and what does the year 2011 mean? It's kind of unclear, as the company's counsel set forth, that's not in the record. There is some references to that information in Respondents Exhibit 3, but it doesn't really explain how or why the company was privileged to interpret either the severance pay provisions in either the collective bargain agreements to not obligate them to owe severance pay in the event of the Air Force insourcing the work. But the year 2011, is that the year that the contract terminated, or what is the importance of 2011? How does that figure in? In 2011, the company was contacted by the Air Force and asked, as the company's counsel represented, for its position on whether or not cost savings could be had if it insourced the work. And both the unions and the company worked together to respond to that, and ultimately the Air Force decided that there were no cost benefits. The Air Force then, the following year, in 2012, decided instead that it would not renew the VOMS contract and would insource the work. All right, but now, what is Exhibit 3? What subject matter does it reference specifically? Again, it's somewhat unclear, because Exhibit 3 is a chain of e-mails between the company and the unions, directed about two things. One, about whether or not the company would allow the merits of this dispute to reach an arbitrator, and what exactly it meant by waiving certain timeliness defenses. And two, the company's view that the union should have been more involved in its bid to try and stop the Air Force from insourcing this work. Oh, to save the jobs. Yeah. All right, now, what does that have to do with this? How did they, did they make any kind of offer or prove that if you would allow this, this is what we would show, and that this is the relevance of it to the arguments that we are making here and to the issues that are before the court? The only, to the extent that that's in the record, the only knowledge that I have is what is communicated in the company's brief in support of exceptions to the board that we lodged with the court on September 8th. All right, now, when they offered this, it was at the trial, I guess, before the administering law judge? Yes. And when they offered it, there had to be some sort of argument in the record as to why it was relevant and why they were offering it, did it not? Yes, and I've, having reviewed the record, I'm kind of unclear as to what that argument was. There seems to be a logical step missing from the representations that the company made to the board as to how the events in 2011 impact the interpretation of the collective bargaining agreement in 2012. And it's unclear to me what that connection is. It was apparently... 2012. 2012 is the year that the contract was terminated? Yes. And the information, was the contract a 3-year contract? It was a 4-year... I'm talking about the CBC, collective bargaining agreement. As I understand the VOMS contract with the Air Force, it was a 2-year contract with 2 additional option years, 2011 and 2012. And the Air Force ultimately decided to exercise the option in 2011 to renew it for the 3rd year. What was the term of the elective, of the period of the electiveness of the bargaining agreement that they talked about? The collective bargaining agreements have, I believe, slightly different terms. The most... The agreement in effect between the company and TWU ran from October 2010 through September 30, 2014, and the agreement in effect between the company and IATSE was effective from September 1, 2011, through August 31, 2014. Was there any argument that the correspondence that they were offered had any... Was there a modification of the contract between the union and the company? No. It was only the matter of their working together to try to save the jobs? Yes, as far as I'm aware. Right now, when the administrative law judge denied the introduction of the evidence, did it give its reasons for denying on the record? I don't actually know the answer to that, Your Honor. I do know that the board did review the company's arguments in that regard on exceptions and upheld the administrative law judge's decision in that respect. All right, and did the board decision fully explain itself? I mean, is the... Why was it excluding the evidence from further consideration? No, and I think part of that is because there was never... It was never really explained what the... It was never really clear what the argument was. All right, are the briefs before the board part of the record here? The company's brief before the board is not part of the record. However, we did lodge it with the court at the court's request. You did what? However, we did lodge it with the court at the court's request. The company's brief to the board. You gave it to us. Yes. We do have it, though. It's not part of the record. Yeah, you have, to my knowledge, everything either in the record or in extra-record material such as the company's exceptions brief, all the company's arguments in regard to what correlation there possibly could be between the discussions with the Air Force in 2011 and these mid-term contract modifications. And I think importantly to note is that the company never accepted to the administrative law judge's finding that logically the Air Force could not be a successor contractor to itself. And in that regard, these arguments in terms of how the decision to insource makes the Air Force a successor contractor under the bargain agreement was not presented to the board. And as such, at least with that regard, the board is entitled to some reinforcement of that portion of its order. What do you do with the argument that's made that it was the board's intervention precluded the parties from going to arbitration and that arbitration would have been a desirable way of proceeding at that point rather than having the board intervene? The board would have... Under Collier Insulated Wire, which is the controlling precedent in this situation, the board would have been happy to defer this matter if three requirements were met. One, a stable bargaining relationship existed. Two, the party in favor of arbitration remains willing to arbitrate the substance of the issue. And three, determination of whether the contract and its meaning are central to the dispute. And it's with element two that the board had issue, because to this date, the company has never stated that it would waive all timeliness defenses. And that is, that waiver of procedural defenses is what the board requires before it will decline to exert its authority under Section 9A of the Act to remedy unfair labor practice. The board says that he agreed in all respects except one minor respect, as I remember. Do you know...? That's incorrect. Reading from the... I'd like to take a moment to actually read from the exhibit that counsel referred to, and I quote from the company's November 27, 2012, email to one of the union presidents, and I quote, We did not agree to waive all timeliness issues. We agreed to allow the grievance and arbitration to proceed for filing purposes, but whether other aspects of timeliness affect entitlement or the timing of payment was not waived. In other words, based on that and based on the fact that the company has never recanted that hedging of its bets as to what timeliness defenses it would waive, the board couldn't defer this. What if the company... I don't know what the company's position would be, but what if the company were to represent in a sufficient way that it would waive all timeliness defenses? Then what would the board do at that point, or where would we be? If that had happened today, I'm not sure what we'd do with that. If that could have happened before the administrative law judge, that could have happened after that email was sent, a clarification, a recanting that they actually did mean to waive all timeliness defenses, that could have even happened on a motion on the company's exceptions to the board. That never happened. And it was the company's burden to make those assurances to the board that the alleged unfair labor practice would actually get to an arbitrator. But I don't understand, really, that you said they had to waive all timeliness issues because they could surely raise timeliness issues before the board in the board's interpretation of the collective bargaining agreement. In other words, the board is just sitting in the same position of the arbitrator. I respectfully disagree with that, Judge Jolly, because what the board's... To the extent that there's a procedural timeliness issue, that must be waived, and the board won't consider that. The only procedural timeliness issues that the board will consider is within Section 10B of the Act, is whether or not the charge was timely filed. The board will consider any sort of reasonable argument. If the argument is supported by a reasonable argument on both sides, then the board backs off and doesn't do anything about it as an unfair labor practice, as I understand the law. And so if they had a genuine, good-faith, timeliness argument that the board cannot consider this because under the contract they were required  then you could not accuse the board of being in bad faith by raising a procedural defense that was provided for in the collective bargaining agreement. And you've got to have bad faith in order for them, in order for the board to act in any way. If they don't find bad faith, they can't act. In... In bad faith, a bargain. Yes. The allegation here... To first respond to that, I think arguably that that is correct, but that's not this case. This isn't a case where the severance pay provision... The company argues that either the severance pay provisions or the vacation pay provisions shouldn't or wouldn't apply because of some procedural timeliness deficiency within the agreement. And, in fact, the company did, in fact, represent to the U.S. Air Force that, in fact, they all did apply. So I do think that while that might be correct in another case, potentially, that's not this case. Well, I mean, it seems to me that what the board... We will not waive time on this as far as the arbitrator is concerned. We will say this case is arbitrable. Give it to the arbitrator. And when we get to the arbitrator, we are naturally going to raise any kind of defenses about it under a good-faith negotiated collective bargain agreement between us and the union. The union can raise them, and we will raise them, and so on. In fact, they would have to do it before the board, it seems to me. That's... See what I'm talking about? I see what you're talking about, Judge Jellian. I agree, and I still think, even with regard to the first issue, with regard to whether this should have even been deferred to arbitration, is there never was this plain commitment from the company to permit this to go on the substance of the issue, as to whatever... What timeliness issues are you talking about? You seem to be talking about two categories of timeliness issues, one internal to the CBA and some other extraneous limitations. What are you talking about? Well, Your Honor, that's... I mean, you personally. I mean, what's the non-waiver provision? Well, Your Honor, I think that's the point, is I don't know. And the company has never explained what it meant by we're willing to waive certain timeliness issues. And to this day, they still haven't explained that. And it's... It seems to me, though, that they have waived the major timeliness issue. They've said, look, we'll put all this before an arbitrator. And when we get before the arbitrator, we're going to raise statute of limitations. He may or may not agree with us. We're not waiving it. We're not waiving our arguments that we have under the CBC. And we are conceding that the arbitrator has the authority to decide to address all the issues raised in the collective bargaining agreement. But that's not quite what the company said here. I understand. And... What did they say other than that? They... They let it before... We waive it before... They're saying we'll let the arbitrator decide the case. That's essentially what they're saying. They... Respectfully, Judge Daly, I disagree. They merely said that they had processed the grievance. They didn't make clear what defenses they'd be raising in front of the arbitrator and whether or not they would be purely procedural based on the grievance and arbitration provisions. What did they say of any exceptions that were made to preserve the point? How did they preserve this point? Um... Did they clarify it or what? Or did they? I... Generally, when determining whether a party has waived a... Or properly accepted to an issue under Section 10E, we generally tend to err on the side of caution. And from reading the company's exceptions to the board, we did feel that the company had put the board on adequate notice that it was challenging the administrative law judge's decision not to defer this matter to arbitration. And in that regard, the company could have clarified some of these wishy-washy or unclear statements as to which or whatever timeliness decisions it would... Or timeliness defenses it would be. If we decide that the employer agreed to have the arbitrator decide this case, and we will raise, and the union can raise, any sort of defenses that are available under the collective bargaining agreement and present them to the arbitrator to decide, then we say, do we say, the labor board therefore abused its discretion in exercising its jurisdiction over this collective bargaining agreement and we deny enforcement? I don't believe so because the board gets a fair amount of deference in terms of its decision not to defer. Deference out of the way. Right or wrong? I believe that the proper course of action for the court in that situation would be to remand it for the board to defer to arbitration to make sure that this did in fact go to an arbitration and that the underlying alleged unlawful contract was addressed by the arbitrator. Remand it to the board not for arbitration but to clarify exactly what they... Both parties clarify exactly what the waiver or non-waiver is and if they're still insisting on some impermissible waiver, that's one thing. But the third question was to clarify what is waived and not waived. Yes, I believe that's correct, but I don't believe that's necessary in this case because the burden is on the party seeking deferral to demonstrate its willingness to arbitrate. And even if the party was arguably willing to arbitrate, which I don't think the record evidence supports in this case, the board's not bound statutorily to yield to other methods of dispute adjustment under Section 10A of the Act. It does abuse its discretion under its own rules if under the correct circumstances it assumes jurisdiction over a case is properly arbitrable. That's correct, Judge Daly, but I can't stress enough that there is devoid in this record... The only thing I would add to that is, as I said earlier, they're taking this money from the government under false pretenses, which seem to me false pretenses, and still, I mean, I'll consider the arguments I made here, but it's highly questionable. That may cover everything, because one of the reasons, as I understand it, that the board has to be satisfied with is that the case is going to be arbitrated in good faith. And if somebody is taking money that we may ultimately determine is taken in bad faith and has not given it to the employees to whom they made the representation it was going to, undermines any kind of good faith or assurance that the Labor Board might have that proper procedures are going to be followed. That, I think, is absolutely the concern in this case, Your Honor. Additionally, I would add that... ..part of the board's Collier inquiry generally and within the board's Collier policy, which has been, at least in regards to these sort of cases, unchanged since 1973, is that even if a party satisfactorily expresses a willingness to arbitrate, the board will not defer if the party's interpretation of the contract is not based under a good faith... ..defensible interpretation of the agreement. I understand the initial prerequisite is that the parties themselves have an ongoing relationship and they're acting in good faith, but they have a dispute that's resolvable in arbitration. So the predicate question is the one that Judge Jolly posed. Yes. Does the board take the position that the company took money in bad faith with no intention of paying it, or instead is it the board's position that the company just took the money and it was undecided at that point to whom it should be paid? The board takes no position on that because the fact that the company was paid by the Air Force is irrelevant as to whether or not there was a mid-term contract modification. The fact that the company lobbied the Air Force under an interpretation of the contract that had both the severance pay and vacation pay provisions applying is the critical inquiry. Where the money... If this court enforces the board's order in full, where the money ultimately comes from is the company's problem. And with regards to if the company took this money, as you suggest, in bad faith from the Air Force and doesn't have it available to pay an enforced order, but arguably that's not our business. I'm just getting you to state your position. No, the board is not taking a position on bad faith. Yes. But we are taking a position that the representation that it needed that money to satisfy these claims does constitute a lack of a sound, arguable basis. The board did make the reference in footnote 3 that we note that prior to the hearing of this case, the reimbursement from the United States Air Force of severance payments that the respondent unconditionally stated it was obligated to make based on the same contract provisions relied on by the general counsel and cited by the judge's decision. Yes, that's... I think that's the only reference that the board made. Yes, and that's... That, as I read the board's decision, is part of the board's rationale that there was no sound, arguable basis. For our inconsistency. Yes, exactly. I see that I'm out of time. If there are no further questions, thank you, Your Honors. Thank you, Mr. Brough. Mr. Banks? Thank you, Your Honor. If I can address a few points here. First of all, in making a claim to the government under the Federal Acquisition Regulation, it is required that things be stated as definitively as they were in that claim. That doesn't mean that that abandons all rights under the collective bargaining agreement. It simply means that with respect to the government, in order to get the money from them, HP3 had to assert it strongly or they weren't going to grant it at all. Now, let's go back for a minute, and they still, to this day, are saying that they will claim it back if a court or arbitrator determines otherwise. So those things, that's why it hasn't been paid out. It's not because the... And there's no proof otherwise. The only proof in the record of why HP3 has not paid this out is because there's a competing claim between the NLRB and the United States Air Force. And so... The money is there. Well, I don't know that, Your Honour. It's just not part of the record. At what point do we send letters to counsel and say, where is that money? Do you still have it? And if you have to come back and say, no, we've spent that money and have it no further, when you obtained it on the pretense that it was for these employees, well, on the reason that it was for these employees, where does that put your case? I think that puts it in the same place it is now, Your Honour, which is deserving of remand. All these things were not addressed by the board. This is an unfair labor practice case, Your Honour. This is not about whether they breached the collective bargaining agreement. If we send it back to the board, then they can find that it was false pretense, that you took the money, that you spent it to pay off other debts unrelated to the employees, and we find that this is bad faith and you cannot rely upon the good faith bargaining of the company in contract with a state outlaw. At least those things have to be addressed. I don't think the court can make those factual determinations now, Your Honour, under SEC v. Chenery. So I think that those things, because the board didn't address those things and didn't consider other important aspects of the case, I think we're left with an incomplete record. So you're suggesting that it be remanded to the board for further clarification as may come out of these arguments? Well, I think it should be remanded to the board for deferral to arbitration. Now, on those issues, before we run out of time, let me address those. First of all... Sorry, Your Honour. I want the question of arbitration. Why isn't the board's award sustainable based on the record that you unequivocally told the United States government that you were liable? Because it had to make a strong statement in order to get the money. And that in and of itself is your interpretation of the contract, the CBA, which is out there. That alone is a sufficient basis for that. Your Honour, because this is not a collective bargaining case. This is an unfair labor practice case. The question is whether HB 3 acted unreasonably, not whether it owes the money. That's not the question. You know, when we look at this... That's my question. Well, Your Honour, I'm sorry. Let me understand what you're asking. Go ahead, if you want to make your submission. Okay, Your Honour. Your Honour, we did raise this in the brief, in the exceptions to the board below on page 12, document 513186848, raises the issue of not deferring this to arbitration and that arbitration was the proper form. When we look at what we waived, and I want to make sure this is clear in the record, the only thing that HB 3 did not agree to waive in terms of timeliness was the timing of the payment. We agreed to defer it to arbitration, and if it had been deferred to arbitration at that time, the only thing that... And it's specifically in there. At T116 on Respondent's Exhibit 3 of the record, you can read it yourself. It specifically says that the only thing that HB 3 did not agree to waive and let it proceed into arbitration was the timing of the payment. In other words, once the government paid it, that it was a prerequisite for the government to pay it first was the only thing that HB 3 did not agree to waive. Because that was before the government had paid you. Right, and it was also at that time we were seeking deferral. The idea... Yes. All we're saying is that if there's an award against us, we are not going to pay it until the government pays us. Yes, and that's fully appropriate under the contract. The contract itself had that 45-day rule that if you didn't object to those letters, which were issued in July of 2012, they didn't file any charges or grievances. Did you ever offer that explanation at all to the board? Yes, Your Honor, we offered all of this, and all of this is in our exceptions to the brief. What you just stated, it was a clarification, an effort to clarify the waiver, and what you've added here is a very specific waiver as to the receipt of addressing that you're inconditioning on the receipt from the payment. You've never stated that before in this argument, and my question is did you tell the appropriate board people that? Yes, Your Honor. In your exceptions, I take it? The NLRB's statement earlier that that was just correspondence between the union and HP3 is not correct. Ms. Pabone was copied on that correspondence. I'm sorry? Ms. Pabone, the NLRB person that was deciding whether to defer it, was copied on that correspondence. Her being copied on it is at T-114. The correspondence is what you just said. Sorry, Your Honor? The correspondence you're referring to is what you just said. Yes, Your Honor, this is Respondents Exhibit 3, and this e-mail chain which talks about this, I mean there was a plethora of correspondence with Ms. Pabone, Chasity Pabone, the NLRB person that was deciding the deferral at that time, and this was also raised with the board, the ALJ. This was raised with the administrative law judge, Your Honor. It was in the record at the time. Ms. Pabone was the person that decides whether to defer it or not. She was the person that decided that. She initially decided to defer it. Well, it took me by surprise. But, I mean, because initially she decided to do it, and then they came back. You've got it in your hand. What does it say? Oh, I'm sorry, Your Honor. What does it say? Do you want me to read it? Well, not that. It's the appropriate language where it conditions, where it says it explains that you're waiting at the payment of the government, that you're not at the timeliness of the payment of the government. It's what you're referring to. Yes, Your Honor. I mean, you know, what we said in this is the whole idea at the time, and it's explained in this e-mail, was that we would defer this arbitration, decide whether it was a termination or a layoff, and then go together for the claim processing if it was determined to be a layoff. All right. It says, Also, as I have discussed this matter with Ms. Bobone, her letter does not our entire written agreement on the timeliness issue. We did not agree to waive all timeliness issues. We agreed to allow the grievance and arbitration to proceed for following purposes, but whether other aspects of a timeliness and entitlement or the timing of payment was not waived. For example, in our June 13th letter, HP3 advised the union that it would seek payment from the government and a claim before having to pay any severance. The union did not challenge that in a timely manner and will not agree to arbitrate that issue. What we did agree to arbitrate is whether we are dealing with a layoff or termination, if the former liability is triggered for the government but not for HP3 until the government pays what it owes. If the latter, nothing is owed at all. As we have explained to the NLRB, while we are not waiting to submit the claim to the government, the government may object to processing it before the arbitrator has ruled it was a layoff, as they have. Consequently, a finding from the arbitrator on liability may be necessary before the government processes the claim. If such occurs, we would expect that the union would join in our claim to the government so that it can be expeditiously paid. That was the plan. So, you know, I mean, the fact that the government has paid it, you know, puts a little, makes us look a little bit different in the eyes of the court, I understand. But it doesn't eliminate the fact that there's no arbitrator or court decision and the government is still claiming it. You said a minute ago in your rebuttal that this matter deserves remand. Yes, Your Honor. If we were to agree with you, I'm not suggesting that there's any chance that we will or we won't, but if we were, what would we say? I mean, specifically remand for what? We have to be specific. What is it that you would seek to be determined or done on remand? I think the court needs to remand it to the board with instructions for two things. One, to consider whether deferral to arbitration is appropriate under the proper idea of, like, if this one waiver of just a procedural or a timing issue is not substantive. So deferral was appropriate at the time. The board can ask the other questions that the court is raising here today as well. But the second issue that has to be addressed on remand, I believe, is the board's interpretation of the contract in light of M&G polymers and also the acceptance of evidence to determine all the context and interpretation of the agreements that are at issue here. That would be the 2011 evidence? Yes, Your Honor, the 2011 evidence, and that's also discussed at T-114. It's discussed in our exceptions as well. I just wanted to be sure that you specified to us what you would expect or ask. I can definitely submit something additional if the court would like clarification on that. If you'd like us to ask exactly what we would want, we can definitely submit that. All right. We have asked questions on rebuttal. Perhaps in LLB you didn't have an opportunity to address. If you wish to address any of the comments that you heard today, you may do so. We can take a motion and a second. Or you could respond if you wish to do so. Yes, very briefly, Your Honor. Just let the clerk know. Wait. He thinks you want argument on it. You want a letter, right? Oh, in a letter. I'm sorry. Just a letter. I'm sorry. Yes. Just a letter, Mr. Gallo. Thank you. Just give us a letter. If you wish, after you've considered what has been said in rebuttal, if you think there's something that was said that you didn't have an opportunity to address, or whatever you want to say in three pages, you can file a letter with us to clarify the matters that have arisen in this argument. And then within five days of receipt of the letter, then you would have an opportunity to respond. Thank you, Your Honor. But only to respond to what he has raised in the letter, nothing more. Yes, Your Honor. And is the company going to give us a letter on what they're seeking on remand? You can. We can certainly ask for that. We'd like that to be included in the letter. Okay. Thank you very much. That concludes arguments we have on the oral argument calendar. And the panel stands in recess until tomorrow morning at 9 o'clock.